## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JANE DOE NO. 2, and JANE DOE NO. 3, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | Case No.   21-CV-240-TCK-SH |
| | ) | |
| OOLOGAH-TALALA INDEPENDENT SCHOOL | ) | |
| DISTRICT NO. 4 OF ROGERS COUNTY, | ) | |
| OKLAHOMA a/k/a OOLOGAH-TALALA | ) | |
| PUBLIC SCHOOLS; MAX TANNER, individually, | ) | |
| and in his capacity as SUPERINTENDENT OF | ) | |
| OOLOGAH-TALALA PUBLIC SCHOOLS; | ) | |
| DAWN MARTINEZ, individually, and in her | ) | |
| capacity as COUNSELOR AT | ) | |
| OOLOGAH-TALALA HIGH SCHOOL; | ) | |
| BRADY DeSPAIN, individually, and in his | ) | |
| capacity as ATHLETIC DIRECTOR and | ) | |
| TITLE IX COORDINATOR OF OOLOGAH- | ) | |
| TALALA PUBLIC SCHOOLS; TONY | ) | |
| SAPPINGTON, individually, and in his capacity | ) | |
| as ASSISTANT SUPERINTENDENT OF | ) | |
| OOLOGAH-TALALA PUBLIC SCHOOLS; | ) | |
| KEVIN HOGUE, individually, and in his capacity | ) | |
| as PRINCIPAL OF OOLOGAH-TALALA | ) | |
| HIGH SCHOOL; TRENT WINTERS, individually, | ) | |
| and in his capacity as COACH at OOLOGAH- | ) | |
| TALALA PUBLIC SCHOOLS; and DeWILTON | ) | |
| RHODEN, individually, and in his capacity as | ) | |
| SCHOOL RESOURCE OFFICER at OOLOGAH- | ) | |
| TALALA PUBLIC SCHOOLS, | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION and ORDER

Before the Court is the Partial Motion to Dismiss filed pursuant to Federal Rule of Civil

Procedure 12(b)(6) by the defendant, Oologah-Talala Independent School District No. 4 of Rogers

County, Oklahoma a/k/a Oologah-Talala Public Schools. (Doc. 25). Plaintiff Jane Doe 2 filed a

Response (Doc. 32), and the School District filed a Reply (Doc. 37).

## I. MOTION TO DISMISS STANDARD

A Complaint must contain "a short and plain statement of the claim, showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A Complaint must contain enough "factual matters, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citations omitted). The trial court must insist the plaintiff put forward specific, non-conclusory factual allegations, to assist the court in determining whether the complaint is plausible. *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008). The mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe [the] plaintiff has a reasonable likelihood of mustering factual support for [the] claims." *Id.* at 1247.

"The nature and specificity of the allegations required to state a plausible claim will vary based on the context." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011). A plaintiff is not entitled to file a bare bones complaint and fill in the necessary facts after discovery is complete. *London v. Beaty*, 612 Fed. Appx. 910, 916 (10th Cir. 2015). The trial court must insist that the plaintiff put forward specific, non-conclusory factual allegations, to assist the court in determining whether the complaint is plausible. *Robbins*, 519 F.3d at 1249.

In ruling on a motion to dismiss, the court must always accept the plaintiff's well-pleaded facts as true and construe them in the light most favorable to the plaintiff. *Archuleta v. Wagner*, 523 F.3d 1278, 1283 (10th Cir. 2008); *Hogan v. Winder*, 762 F.3d 1096, 1104 (10th Cir. 2014). Under this standard, a complaint may not be dismissed on the grounds that the court thinks it

unlikely that the allegations can be proven. *Twombly*, 127 S.Ct. at 1974; *Spradlin v. City of Owasso*, 2014 WL 1664974 *2 (N.D.Okla.) (holding that "a well-pleaded complaint may proceed even if actual proof of those facts seems improbable, and that a recovery is very remote and unlikely"). Indeed, "it is well established that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle plaintiff to relief." *Issa v. Comp USA*, 354 F.3d 1174, 1177-78 (10th Cir. 2003); citing *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991).

## II. BACKGROUND

Pursuant to the standard set forth *supra*, accepting the plaintiff's well-pleaded facts as true and construing them in the light most favorable to plaintiff, the following facts are alleged in Plaintiffs' Second Amended Complaint:

1. This is an action for violation of various civil rights codified in the federal statutes, along with claims arising under state law against the Defendants in their individual capacities, and as employees and agents of Independent School District No. 4 of Rogers County, Oklahoma a/k/a Oologah-Talala Public Schools ("OTPS") arising out of a pervasive and repeated pattern of sexual harassment, inappropriate touching of a minor by OTPS staff and inappropriate sexual and lewd comments against Plaintiffs.

2. Jane Doe No. 2 is a female and was a minor at all relevant times alleged in this Second Amended Complaint, and she was required to attend school per 70 O.S. § 10-105. She attended high school at OTPS. Jane Doe No. 2 has now reached the age of majority, is an adult and is entitled to bring this action in her own name.

3. Jane Doe No. 3 is a female and was a minor at all relevant times alleged in this Second

Amended Complaint, and she was required to attend school per 70 O.S. § 10-105. She attended high school at OTPS. Jane Doe No. 3 has now reached the age of majority, is an adult and is entitled to bring this action in her own name.

4. At all material times, Jane Doe No. 2 and Jane Doe No. 3 were residents of Rogers County, Oklahoma.

5. OTPS is a public educational institution located in Rogers County, Oklahoma, and is formally titled Independent School District No. 4 of Rogers County, Oklahoma. It is a school district organized under the laws of the State of Oklahoma, with its principal office in Rogers County, Oklahoma.

6. OTPS receives federal funding and is subject to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681-1688.

7. Max Tanner is a natural person who at all times relevant was the Superintendent of the Oologah-Talala Public Schools located in Rogers County, Oklahoma. At all relevant times, Max Tanner is believed to have been a resident of Rogers County, Oklahoma.

8. Tony Sappington is a natural person and the Assistant Superintendent employed at OTPS. At all relevant times, Tony Sappington was a resident of Rogers County, Oklahoma.

9. Dawn Martinez is a natural person and was at all relevant times employed by OTPS as a Counselor at Oologah-Talala High School. Upon information and belief, at all relevant times, she was a resident of Rogers County, Oklahoma.

10. Brady DeSpain is a natural person and was at all relevant times employed by OTPS as the Athletic Director and the Title IX Coordinator at OTPS. Upon information and belief, at all relevant times, he was a resident of Rogers County, Oklahoma.

11. Kevin Hogue is a natural person and was at all relevant times employed by OTPS as the Principal at Oologah-Talala High School. Upon information and belief, at all relevant times, Kevin Hogue was a resident of Rogers County, Oklahoma.

12. Trent Winters is a natural person and at all times relevant was employed by OTPS as a teacher and as an Assistant Basketball Coach at Oologah-Talala Public Schools.

13. At all relevant times, DeWilton Rhoden was the School Resource Officer at OTPS. As School Resource Officer, OTPS provided DeWilton Rhoden with office space on the OTPS campus, paid $19,500.00 of DeWilton's Rhoden's annual salary in ten (10) monthly installments and OTPS contracted that DeWilton Rhoden could not be hired or fired without the approval of OTPS.

14. Venue is proper in this district as the Defendants do business in this district, the events giving rise to these claims took place in this district, and the Defendants reside in this district.

15. Jane Doe No. 2 has complied with the Oklahoma Governmental Tort Claims Act and that her claims have been denied as Defendants took no formal action upon the Tort Claim Notice(s). Jane Doe No. 3 is not making state law tort claims in this suit.

16. The Defendants are required by law to provide a safe learning environment for its students, including Jane Doe No. 2 and Jane Doe No. 3. They failed to do so.

17. The Defendants failed to provide OTPS students with an environment free of sexual predators and free of inappropriate touching, sexual comments and sexual harassment.[1] During the fiscal years 2018-2019 and 2019-2020, students at OTPS were preyed upon by OTPS employee, Trent Winters, even after OTPS was on actual notice of a pervasive culture of sexual abuse, inappropriate touching, sexual comments and sexual harassment. Trent Winters has been indicted for these actions related to multiple OTPS students, including Jane Doe No. 2 and Jane Doe No. 3.

18. OTPS hired Trent Winters after he previously left a teaching/coaching job at Braggs Public Schools where allegations of inappropriate conduct, including messages of a sexual nature, were raised. Trent Winters was cited by police for this conduct, and upon information and belief, admitted this conduct to his employer, the Braggs Board of Education, and apologized for the same. This information was available to OTPS at the time of his hiring.

19. Unfortunately, for the students at OTPS, this was not the first time OTPS hired a coach with previous allegations of sexual misconduct which were public record before his hiring with OTPS.

20. OTPS's decision to hire staff with a known history of misconduct placed students at a heightened risk of being vulnerable to sexual misconduct. This was a heightened risk of which OTPS students were unaware. This risk was known, by OTPS, when Trent Winters was hired since

---

1. Indeed, another teacher and the Defendant in the Jane Doe No. 1 Action "Daniel Bodine", while on the Oologah-Talala school grounds and during school hours, preyed on a female victim known as Jane Doe No. 1. A criminal matter is likewise pending against Bodine. Moreover, former OTPS teacher, Katie Wilmott, faces rape in the second degree charges related to an OTPS student. Two other OTPS teachers, Haylie Smart and Chase Kine, have had their teaching certificates suspended for inappropriate relations with students. This just since 2016.

he already made inappropriate and sexual comments to students, and there were rumors about his involvement with students. OTPS knew this would adversely affect the students, including Jane Doe No. 2 and 3.

21. Well prior to November 4, 2019, OTPS and its staff were on actual notice from the Oklahoma State Board of Education that Defendants were not complying with Title IX of the Education Amendments of 1972 with regard to OTPS students.

22. Defendants' indifference to the safety and well-being of its students has caused sexual misconduct to flourish at OTPS. This toxic culture, which has drawn the attention and censure of the Oklahoma State Board of Education, continues to thrive to this day.

23. On October 24, 2019, a mere eleven (11) days before November 4, 2019, the date of new reported allegations raised by OTPS parents and students against Trent Winters, OTPS and its staff members were called before the Oklahoma State Board of Education to discuss the Defendants' lack of compliance with Title IX of the Education Amendments of 1972.

24. At the October 24, 2019 meeting with OTPS, the Defendants assured the Oklahoma State Board of Education, an administrative body, that OTPS would take future complaints by students and/or parents of a sexual nature seriously and that Defendants would comply with Title IX of the Education Amendments of 1972. Defendants did not do so.

25. As early as November, 2018, more than one (1) year prior to the reports involving Jane Doe No. 2 and Jane Doe No. 3, OTPS was on actual notice from a parent regarding Trent Winters making inappropriate and lewd statements to students and being referred to by students as "Coach Perv," as the same was reported by the parent directly to OTPS middle school principal, Kelly Dixon. OTPS did not properly investigate these allegations, and Ms. Dixon did not report these

parent concerns to law enforcement, to the Oklahoma Department of Human Services, or to the Oklahoma State Board of Education.

26. From the 2018-2019 fiscal year, until the resignation of Trent Winters on December 13, 2019, Jane Doe No. 2 and Jane Doe No. 3 were the victims of ongoing sexual harassment, lewd comments and sexual misconduct by predator, Trent Winters. After their report of the same inappropriate behavior on November 4, 2019, and continuing throughout the end of basketball season in the winter of 2020, Jane Doe No. 2 and Jane Doe No. 3 were the victims of retaliation by OTPS and its staff.

27. Trent Winters, acting in the course and scope of his employment, was a teacher for OTPS in 2018-2019 and 2019-2020 fiscal years. During these fiscal years, he served as a teacher at the Oologah-Talala Middle School and as an assistant coach to the OTPS High School girls basketball team.

28. In fiscal years 2018-2019 and 2019-2020, Jane Doe No. 2 and Jane Doe No. 3 were students playing on the OTPS high school girls basketball team.

29. Trent Winters made inappropriate sexual and/or lewd comments and inappropriately touched the body and/or private parts of Jane Doe No. 2, while on the OTPS high school campus, during school sponsored activities and/or during school hours.

30. Trent Winters made inappropriate sexual and/or lewd comments and sexually harassed Jane Doe No. 3, while on the OTPS high school campus, during school sponsored activities and/or during school hours.

31. Trent Winters inappropriate comments and sexual conduct began during the 2018-2019 fiscal year and continued until he was eventually removed from coaching and later resigned his

8

teaching position at OTPS during the 2019-2020 fiscal year.

32. The inappropriate touching, sexual harassment, and sexually inappropriate and lewd comments by Coach Trent Winters were observed and overhead by multiple OTPS students and the OTPS Assistant Basketball Coach, Amy Jahn, during school activities and/or during school hours. Moreover, they were conducted at a time when OTPS Basketball Coach Doug Winters, was present and had direct oversight over his son and subordinate, Trent Winters.

33. Amy Jahn failed to report the inappropriate touching and inappropriate sexual comments to school district administrators as they occurred. She never reported the same to the Department of Human Services, to the police, to the Oklahoma State Department of Education, nor to the parents of Jane Doe No. 2 or Jane Doe No. 3. This is despite Amy Jahn's concern that Defendants were "teaching" the Plaintiffs "how to be in an abusive relationship."

34. On November 4, 2019, during school hours, multiple students, including Jane Doe No. 2, advised OTPS High School Counselor, Dawn Martinez, about the inappropriate touching of Jane Doe No. 2, ongoing sexual harassment and sexually inappropriate comments made to and about students, including Jane Doe No.2 and Jane Doe No. 3, involving Assistant Basketball Coach Trent Winters. This reporting included information that Jane Doe No. 3 was the victim of sexual harassment and/or sexual or lewd comments by Trent Winters about her buttocks and wanting "to get with" Jane Doe No. 3. This sexual misconduct by Trent Winters was substantiated by OTPS employee, Amy Jahn.

35. On November 4, 2019, OTPS Athletic Director and Title IX Coordinator, Brady DeSpain, received a complaint of misconduct by Trent Winters by another OTPS Parent. Later that evening, he received another report of sexual misconduct and lewd comments by Trent

Winters from the parent of Jane Doe No. 2. Brady DeSpain did not report these allegations to law enforcement, the Department of Human Services or the Oklahoma State Board of Education. Moreover, Brady DeSpain did not undertake to investigate these allegations.

36. During the thirty-six (36) days that followed the first report by Jane Doe No. 2 and other OTPS students, including a report about the sexual harassment of Jane Doe No. 3, OTPS Counselor, Dawn Martinez, did not inform the Department of Human Services or the police of the allegations regarding the inappropriate touching and/or the sexually inappropriate lewd comments. She further did not notify the Oklahoma State Board of Education.

37. At no time did OTPS Counselor, Dawn Martinez, report the allegations of inappropriate touching, ongoing sexual harassment and sexually inappropriate lewd comments to the parents of Jane Doe No. 2. This violates the Oklahoma Parents Bill of Rights, 25 O.S. § 2001, et seq.

38. During the thirty-six (36) days that followed the first report, which contained information about lewd comments, sexual harassment and the misconduct by Trent Winters related to Jane Doe No. 3, Dawn Martinez did not seek to talk to Jane Doe No. 3 nor to investigate these allegations pertaining to Jane Doe No. 3. Dawn Martinez also failed to contact the parent(s) of Jane Doe No. 3 about the allegations related to Jane Doe No. 3. This violates the Oklahoma Parents Bill of Rights, 25 O.S. § 2001, et seq.

39. On or about November 4, 2019, Dawn Martinez advised OTPS Principal Kevin Hogue and OTPS Superintendent Max Tanner that she had received allegations of ongoing sexual harassment, lewd comments, and/or sexual misconduct against Trent Winters. Neither Max Tanner nor Kevin Hogue reported to the parents of Jane Doe No. 2 or Jane Doe No. 3, to law enforcement, the Oklahoma Department of Human Services, or the Oklahoma State Board of Education upon

receiving this report.

40. On November 4, 2019, members of the OTPS Board of Education, OTPS Superintendent Max Tanner, and OTPS Athletic Director and Title IX Coordinator Brady DeSpain, were made aware of the allegations of sexual harassment, inappropriate touching and sexually inappropriate comments made by Assistant Basketball Coach Trent Winters to students, including Jane Doe No. 2 and Jane Doe No. 3. OTPS staff were made aware that one of the individuals reporting the sexually inappropriate behavior by Assistant Basketball Coach Trent Winters, was the daughter of OTPS Athletic Director Brady DeSpain, and another was the child of OTPS Middle School Principal Kelly Dixon.

41. Upon information and belief, parents of multiple OTPS students reported inappropriate touching, ongoing sexual harassment, and/or sexually inappropriate comments regarding Trent Winters to OTPS personnel, including but not limited to Principal Kevin Hogue, Middle School Principal Kelly Dixon, OTPS Assistant Superintendent Tony Sappington, OTPS Athletic Director and Title IX Coordinator Brady DeSpain, and Board of Education President Don Tice.

42. During the thirty-six (36) days that followed the initial November 4, 2019 reports of the inappropriate comments, ongoing sexual harassment, and inappropriate touching by Trent Winters, Defendants failed to report the allegations of sexual misconduct and lewd comments by Trent Winters to a law enforcement agency, to the Department of Human Services and/or to the parents of Jane Doe No. 2 and Jane Doe No. 3.

43. Between November 4, 2019 and December 9, 2019, the Defendants did not seek a statement from Jane Doe No. 2 on her allegations. Moreover, at no point on or after November 4, 2019, did any of the Defendants seek a statement from Jane Doe No. 3, nor did they attempt to

11

investigate the allegations of ongoing sexual harassment and lewd comments directed to and about Jane Doe No. 3.

44. DeWilton Rhoden abrogated his responsibilities as a law enforcement officer and/or school resource officer. He wholly failed to conduct any investigation or to file any report with a police department regarding the allegations of students at OTPS about Trent Winters. DeWilton Rhoden failed to interview any of the complainants or their parents, and perhaps most importantly, he failed to interview Trent Winters. Moreover, he failed to interview the OTPS staff whose complaints were made to by parents and/or students.

45. Part of the legal responsibilities of teachers, resource officers, and/or administrators of OTPS are to receive reports of sexual misconduct and lewd comments suffered by students, especially when that misconduct occurs on school property, during school hours, and/or during school sponsored activities.

46. Instead of OTPS staff immediately reporting, as required by 1OA O.S. § 1-6-102 and 10A § 1-2-202(B)(2), Defendants took no action. In fact, after the November 4, 2019 report by Jane Doe No. 2 and other students to Dawn Martinez, Ms. Martinez sent Jane Doe No. 2 and other students who had made complaints of a sexual nature regarding Trent Winters to basketball practice where they would be in the presence of and under the guidance and control of their reported abuser, Trent Winters. Dawn Martinez further took no action to ensure the safety of Jane Doe No. 3 regarding the allegations pertaining to her, allowing her to attend basketball practice with her alleged abuser, Trent Winters. This is tantamount to retaliation.

47. On the morning of November 5, 2019, the parents of Jane Doe No. 2, had an in-person meeting with OTPS Superintendent, Max Tanner, and OTPS Assistant Superintendent, Tony

12

Sappington, to discuss the inappropriate touching and ongoing sexually inappropriate comments made by Assistant Basketball Coach, Trent Winters, and to request a full and complete investigation. During this meeting, the parents of Jane Doe No. 2 advised these administrators that they believed Trent Winters was a sexual predator. Neither Max Tanner nor Tony Sappington reported this information to the Department of Human Services as required by law.

48. Despite this being a Title IX issue, OTPS failed to invite its Title IX Coordinator, Brady DeSpain, to attend this meeting, nor did the Title IX Coordinator follow up with Jane Doe No. 2 or her family after this meeting. These failures violate Title IX of the Education Amendments of 1972.

49. Jane Doe No. 3 and her parents were never given the opportunity to speak with Defendants about the allegations pertaining to her, despite those allegations having been brought to the Defendants' attention by OTPS students and OTPS staff member Amy Jahn on November 4-5, 2019.

50. After the report, the allegations of inappropriate sexual touching of a minor, ongoing sexually lewd and inappropriate comments, and sexual harassment involving Assistant Basketball Coach Trent Winters were confirmed by OTPS staff members, including Amy Jahn, to OTPS Superintendent Max Tanner and Assistant Superintendent Tony Sappington. Inexplicably, for at least thirty-five (35) days after these allegations were substantiated by Ms. Jahn, OTPS staff and administrators purportedly failed to interview any of the students who raised allegations of sexual misconduct by Trent Winters and failed to further investigate the allegations that other students, like Jane Doe No. 3, were the victims of ongoing abuse, sexual harassment, and lewd comments by Trent Winters.

13

51. The OTPS staff member who confirmed the allegations of inappropriate touching and ongoing sexually inappropriate comments and harassment by Assistant Basketball Coach, Trent Winters, had not previously reported the same to OTPS administrators, law enforcement nor to the Oklahoma Department of Human Services as required by Oklahoma statute.

52. Assistant Basketball Coach, Trent Winters, was not immediately removed from his teaching and/or coaching position(s) at OTPS while the allegations of students were being investigated. In fact, Trent Winters was never relieved of his teaching duties by OTPS administrators. Instead, his voluntary resignation was accepted in January, 2020.

53. Because of Defendants lack of response to the allegations, Trent Winters was allowed to remain on OTPS property and to remain in charge of students for weeks following the reports by multiple students and parents of his sexual misconduct.

54. Jane Doe No. 2 and her parents and Jane Doe No. 3 and her parents were not kept informed of the investigation into the sexual misconduct of Trent Winters, as required by Title IX of the Education Amendments of 1972. Instead, OTPS Assistant Superintendent Tony Sappington improperly advised Jane Doe No. 2's family he could not give any information on the investigation, and the OTPS Title IX Coordinator Brady DeSpain provided no information to Jane Doe No. 2 or her family, nor to Jane Doe No. 3 or her family.

55. On November 14, 2019, Jane Doe No. 2's father and OTPS Board of Education President, Don Tice, conducted a telephone meeting regarding the inappropriate sexual touching, lewd comments and sexual harassment claims involving Assistant Basketball Coach, Trent Winters. During this telephone conference, the parent made OTPS School Board President, Don Tice, aware of the fact that neither the OTPS Superintendent nor OTPS Assistant Superintendent

had provided any update or acknowledgement of any investigation of the pending allegations. At that point in time, OTPS School Board President, Don Tice, was made aware that none of the students who had reported the inappropriate touching, ongoing sexually inappropriate comments and ongoing sexual harassment to OTPS Counselor, Dawn Martinez, had been questioned or asked to give a written statement by any other staff member or administrator at OTPS. Additionally, OTPS School Board President, Don Tice, was made aware by the parent that the OTPS Athletic Director and Title IX Coordinator, Brady DeSpain, had advised the family they just needed to focus on basketball, rather than the pending allegations.

56. On November 27, 2019, having received no investigation or action by OTPS to stop or curtail the misconduct, the parents of Jane Doe No. 2 contacted Oklahoma State Board of Education's office to notify it of the allegations of sexual misconduct pending against a teacher and coach at OTPS.

57. On November 20, 2019, the Oklahoma State Department of Education, Elizabeth Suddath, advised Jane Doe No. 2's parents that the Oklahoma State Department of Education would begin investigating a Title IX offense involving OTPS Assistant Basketball Coach Trent Winters.

58. OTPS, its staff, administrators and board members have allowed a pervasive culture of sexual abuse and sexual harassment of its students by OTPS staff and coaches. Since 2016, at least five (5) staff members have resigned, been fired or had criminal charges brought for sexual misconduct related to OTPS students.

59. Defendants have created a pervasive culture of not promptly reporting sexual misconduct to law enforcement and the Department of Human Services and this is evidenced by

the multiple instances of sexual misconduct.

60. It was not until December 9, 2019, and only after pressure was executed by the Oklahoma State Board of Education office, that OTPS staff began to investigate the allegations of ongoing sexual misconduct involving Assistant Basketball Coach Trent Winters.

61. As of December 9, 2019, no action had been taken by OTPS staff or the OTPS Board of Education to remove Assistant Basketball Coach, Trent Winters, from his teaching duties at OTPS despite knowledge of the incidents of inappropriate touching, sexually charged comments, and ongoing sexual harassment being directly witnessed and overheard by school officials.

62. On November 18-19, 2019, OTPS Superintendent, Max Tanner, advised the Oklahoma State Board of Education that the sexual misconduct allegations against Trent Winters were a "he said/she said scenario," despite the fact that Max Tanner and OTPS administrators were aware these statements had been substantiated by OTPS staff member, Amy Jahn.

63. On December 9, 2019, OTPS Athletic Director and Title IX Coordinator, Brady DeSpain, advised that the students who made sexual misconduct allegations against Trent Winters, including his own daughter, "were just being dramatic."

64. It is clear the sexual misconduct allegations from multiple students, pertaining Jane Doe No. 2 and Jane Doe No. 3, among others, were not taken seriously by OTPS staff and administrators.

65. Due to the Defendants' affirmative actions, Jane Doe 1 and 2 were placed in direct harm.

66. On December 9, 2019, Jane Doe No. 2's father emailed OTPS High School Principal, Kevin Hogue, and advised him regarding the sexual misconduct directed to Jane Doe No. 2 by

16

Trent Winters. The father further advised OTPS Principal Kevin Hogue that it was apparent the school was failing to act in an appropriate and lawful manner by failing to report, and failing to immediately investigate the allegations. Moreover, the father advised OTPS Principal Kevin Hogue that the school was only now investigating the incident after the father himself had contacted the Oklahoma State Department of Education and had it begin the Title IX investigation into the actions of OTPS and its staff.

67. On December 9, 2019, only after being contacted by the Oklahoma State Department of Education, did Defendants elect to get any written statements from OTPS students about the allegations. Despite being on actual notice of the sexual harassment of and lewd comments by Trent Winters related to Jane Doe No. 3, Defendants opted not to get a statement from her. Defendants persevered in their refusal to speak with and/or get a statement from Jane Doe No. 3, even after the written statement of Dawn Martinez, Amy Jahn and at least one student's written statement reflected the sexual harassment of Jane Doe No. 3.

68. As a result of the sexual misconduct of Trent Winters, Jane Doe No. 2 and/or Jane Doe No. 3 have suffered from low self-esteem, depression, an eating disorder, physical sickness and other psychological and emotional issues. Additionally, they were retaliated against by OTPS staff, including Doug Winters, the father of Trent Winters, as Jane Doe No. 2's playing time was substantially decreased, and both Jane Doe No. 2 and Jane Doe No. 3 were thereafter subjected to Doug Winters' harsh temper and harassing questions about the allegations.

69. As a result of its investigation into these allegations, the Oklahoma State Board of Education has suspended the teaching certificate of Trent Winters.

70. The Defendants failed to properly execute and/or enforce policies in regard to the

reporting of sexual misconduct to state agencies to protect students from abuse and to end the access of students to suspected predators. The inadequacy of Defendants' enforcement and handling of these policies resulted in the deprivation of Plaintiff's statutory, constitutional and common law rights.

71. The Defendants were acting as temporary guardians of Jane Doe No. 1 and No. 2 while on the OTPS campus.

72. OTPS failed to ensure that all of their employees, teachers, school resource officer, and administrators were properly hired, trained, retained, and supervised to perform their jobs and legal responsibilities.

73. As a result of repeated violations of Title IX of the Education Amendments of 1972 by OTPS and its staff members, the Oklahoma State Board of Education publicly censured OTPS and Max Tanner on July 21, 2020, for their "roles in contributing to a school culture in which student complaints were treated dismissively… It is because of these failures to act promptly and appropriately to protect students, and the ongoing failure to implement corrective measures with Fidelity, that your District now holds a probationary accreditation status." See Exhibit 5.

74. In its correspondence to OTPS and Max Tanner dated July 21, 2020, the Oklahoma State Board of Education, an administrative body, determined that OTPS and its staff "have failed both your duties and your students" on Title IX issues.

75. The Oklahoma State Board of Education, an administrative body, has determined that OTPS and its staff "have displayed a shocking disregard for students' voiced concerns, no doubt contributing to an environment that discourages students from coming forward for help."

### III. ANALYSIS

### A. Oklahoma Governmental Tort Claims Act

Plaintiff Jane Doe No. 2 has asserted a state law negligence claim pursuant the Oklahoma Governmental Tort Claims Act, Okla.Stat. tit. 51, et seq. (the "GTCA"). The claim has four prongs: (1) Plaintiff first alleges Defendants negligently hired the defendant, Trent Winters ("Winters" ); (2) Defendants negligently supervised Winters; (3) Defendant failed to properly train its employees, and (4) Defendants negligently retained Winters.

Under the GTCA, the state waives sovereign immunity from suit in certain circumstances. Okla. Stat tit. 51, § 153. One exemption from liability is for performing, or failing to perform "any act or service which is in the discretion of the [Defendant] or its employees." Okla. Stat. tit. 51, § 155 (5). The Oklahoma Supreme Court has stated "the discretionary function exemption from governmental tort liability is extremely limited. This is so because a broad interpretation would completely eradicate the government's general waiver of immunity. Almost all acts of government employees involve some element of choice and judgment and would thus result in immunity if the discretionary exemption is not narrowly construed. Just as the waiver is not a blue sky of limitless liability, the discretionary exemption is not a black hole enveloping the waiver." *Nguyen v. State*, 788 P.2d 962, 964 (Okla. 1990); see also, *J.W. v. Independent School Dist. No. 10 of Dewey County*, 500 P.3d 649, 661 (Okla. App. 2021).

In *Nguyen*, the court endorsed the "planning-operational approach" to the exemption. "Under this approach initial policy level or planning decisions are considered discretionary and hence immune, whereas operational level decisions made in the performance of the policy are considered ministerial and not exempt from liability." *Id*. at 964-65.

Applying this standard in a school setting, the Court in *J.M. v. Hilldale Indep. School Dist. No. 1-29 of Muskogee County, Oklahoma*, 2008 WL 2944997, *12 (E.D. Okla. 2008), aff'd 397 Fed. Appx. 445 (10th Cir. 2010) considered whether the discretionary function exemption applied to the negligent hiring, training, supervision, and retention of a school's staff member. The plaintiff brought suit against the school after one of its teachers began having a sexual relationship with the plaintiff. The school sought summary judgment, arguing it was immune under the discretionary function exemption in 51 Okla. Stat. tit. 51, § 155(5). The Court, however,   disagreed, noting:

> [W]hile §155 applies to discretionary functions including policymaking and planning decisions, the exemption does not apply to negligent performance of policy… The Court construes §155(5) to prevent the use of a tort action to challenge policy, but not necessarily to prevent challenging the School District's conduct in implementing policy.
>
> The choices inherent in hiring, retaining, and supervising a particular [employee] are not policy choices our legislature intended to immunize. They do not affect the "big picture" but rather have impact on a very small scale. These decisions must be made by every school district when a position is vacant and must be filled. Such decisions are no different than a government employee's decision to turn left or right at a stop sign. Actions of this nature are not immune from liability because they are not policy decisions implicating government functions.

*J.M.*, 2008 WL 294497, at *11-12 (quoting *Doe v. Cedar Rapids Community School District*, 652 N.W.2d 439, 445 (Iowa 2002)).

The Court continued, stating:

> In order to obtain immunity under § 155(5), the particular act sought to be immunized must be both discretionary and involve a policy choice. "The majority approach under the Federal Tort Claims Act ("FTCA") and similar state acts is the planning-operational approach," which was developed in *Dulehite v. United States*, 346 U.S. 15 (1953), *overruled on other grounds*, and has

subsequently been followed by federal and state jurisdictions. *Id.* Under this approach:

> Once a discretionary policy decision has been made, government employees have a duty to execute the policy on the operational level without negligence. Moreover, the general rule under the planning-operational test is that the discretion is exhausted by the initial adoption of policy, and that decisions to apply broad policy in specific cases are operational decisions. Thus, under this approach the government retains its immunity with respect to formulation of policy, but it is subject to liability for routine decisions and daily implementation of the policy or planning level decision.

*Id.*, 2008 WL 2944997, at * 11 (quoting, *Nguyen*, 788 P.2d at 962, 965).

### 1. Negligent Hiring

The Oklahoma Supreme Court has held that employers may be held liable for negligence in hiring an employee when recovery is sought for the employer's negligence. See *N.H. v. Presbyterian Church (U.S.A.)*, 998 P.2d 592, 600 (Okla. 1999).

> In such instances, recovery is sought for the employer's negligence. The claim is based on an employee's harm to a third party through employment. An employer is found liable, if—at the critical time of the tortious incident—, the employer had reason to believe that the person would create an undue risk of harm to others. Employers are held liable for their prior knowledge of the servant's propensity to commit the very harm for which damages are sought. In Oklahoma, the theory of recovery is available if vicarious liability is not established. In other jurisdictions, actions against churches for negligent hiring, supervision and retention have been allowed when the supervising authority had notice sufficient to prevent reasonably foreseeable harm caused by sexual advances of its ecclesiastical representatives. The critical element for recovery is the employer's prior knowledge of the servant's propensities to create the specific danger resulting in damage.

Plaintiff asserts Winters was hired by the School District despite the fact that prior allegations of sexual misconduct had been asserted against him at his previous teaching job in

Braggs, Oklahoma. (Second Amended Complaint at § 161). Further, Plaintiff contends Winters had been cited and pled guilty to the misconduct, all of which was public record at the time of his hiring by the School District. Plaintiff identifies additional public records available to the School District when it hired Winters which would have revealed a public statement by Winters on January 13, 2016, in which he admitted he had been previously accused of sleeping with students. *Id*. at § 162. Moreover, Plaintiff asserts the School District had a history of hiring coaches with previous allegations of sexually inappropriate behavior with students. *Id*. at § 161. Therefore, Plaintiff contends the School District had sufficient notice of Winter's propensities to prevent the reasonably foreseeable harm to Plaintiff caused by the sexual advances of Winters.

"The highest duty of a public education entity is to ensure the safety and well-being of students attending school, and the State Board operates with that duty foremost in its considerations." (Doc. 2-2 at 2). Title IX of the Education Amendments of 1972 ("Title IX"), the federal education law that prohibits sex and gender based discrimination in schools, is a crucial framework for ensuring students are able to learn in an environment free of sexual harassment and assault. Under Title IX, school officials who have been made aware of alleged sexual harassment must respond in a way that is not deliberately indifferent --failing to do so is a violation of federal law, and may be grounds for potential liability. See, *School Gesber v. Lago Vista Indep Dist.*, 524 U.S. 274 (1998).

All Oklahoma school districts, as recipients of federal funds, are subject to the requirements of Title IX. See 334 C.F.R. §§ 106.2, 106.4. Further, under Title IX, every school district must designate a "responsible employee" to serve as Title IX coordinator, who has the duty of overseeing the district's implementation of the law. See 34 C.F.R. §106.8.

Considering this policy prohibiting discrimination, harassment and retaliation adopted by the School District pursuant to Title IX, and in light of the holdings in *N.H. v. Presbyterian Church (U.S.A.)*, *J.W* and *J.M.*, the Court finds the School District's employment decisions, as they related to the hiring of Winters were operational, rather than discretionary. The School District had a duty to execute the policy on the operational level without negligence. *Id.* The facts as alleged by Plaintiff demonstrate the School District had sufficient notice at the time of Winter's employment to believe he could create an undue risk of harm to its students. Accordingly, the School District's Partial Motion to Dismiss as to this cause of action is denied.

### 2. Negligent Supervision

Plaintiff also claims the School District is liable under the GTCA for its negligent supervision of Winters. Although there is no Oklahoma case directly on point, the Court in *Cooper v. Millwood Independent School District*, 887 P.2d 1370 (Okla. App. 1994) found the petition validly stated a claim against the school district for negligent supervision and also recognized a duty on the part of the school district to keep the plaintiff student safe from danger. Although the defendant argued it had no legal duty to a student to prevent injury from another student, the court found otherwise. The court found that "[w]hen a special relationship between the parties exists and when the occurrence of harm or damage to one party is foreseeable, a legal duty to control the actions of third persons will be found." *Id.* citing *Wofford v. Eastern State Hospital*, 795 P.2d 516, 519 (Okla. 1990).

"Other Courts have imposed liability on a school when foreseeable acts of third parties cause harm to students in the school's care. *Id.* citing *Kansas State Bank and Trust Co. v. Specialized Transportation Services, Inc.*, 819 P.2d 587 (1991); *Randell v. Tulsa Independent*

23

*School District No. 1*, 889 P.2d 1264 (1994). "A child while in school is deprived of the protection of his parents or guardian. Therefore, the actor who takes custody of a child is properly required to give him the protection of which the custody has deprived him." *J.W. v. Indep. School Dist. No. 10*, 500 P.3d 649, 666 ( Okla. App. 2021) citing *Brewer v. Murray*, 292 P.3d 41 (Okla. Civ. App. 2012).

In *J.S. v. Harris*, 227 P.3d 1089 (Okla. App. 2009), the Oklahoma Supreme Court reiterated that "while an individual would normally owe no duty of care to a third person for the acts of another, every person is under a duty to exercise due care in using that which he/she controls so as to not injure another." citing *Lockhart v. Loosen*, 943 P.2d 1074, 1080 (1997).   In order for a duty to arise, "however, those persons bearing the duty's onus must have knowledge that their acts or omissions involve danger to another." *Id.* at n. 26.

"Based upon the special relationship between a school and its students, claims against a school district based on its own negligence may be pursued. The negligence claim before us is no different from the judgments of private individuals which are reviewed every day through the mechanism of an action in tort. Personal injury from ... the negligence of those into whose care [children] are entrusted is not a risk that school children should, as [a] matter of public policy, be required to run in return for the benefit of a public education. Applying traditional tort principles, the courts are perfectly capable of adjudicating the reasonableness of hiring, retaining, and supervising a particular teacher." *J.M. v. Hilldale Independent School Dist*. at *3.

Plaintiff alleges that because the School District had prior knowledge of Winter's sexual misconduct, the resulting harm to her was foreseeable. Further, even after numerous complaints by both students and parents about Winter's inappropriate conduct, Winters was allowed to remain

24

on campus and in the School District's employment. Because the discretionary function immunity does not apply to this claim, the School District's Partial Motion to Dismiss as to this cause of action is denied.

### 3. Failure to Train

Plaintiff also contends that if the School District had trained its staff regarding the requirements of Oklahoma statutory law, Plaintiff's abuse would have been prevented. ***Teachers and all other school officials and personnel*** have a legal obligation to report suspected child abuse of any student under the age of eighteen (18) to the Department of Human Services and law enforcement. Okla. Stat. tit. 10A, § 1-2-101(B)(2)(a) and (b). Further, Okla. Stat. tit. 10A, § 1-2-101 (B)(1) requires "**every *person having reason to believe*** that a child under the age of eighteen (18) years is a victim of abuse or neglect," to report it "immediately to the Department of Human Services." (emphasis added).

A "person who knowingly and willfully fails to promptly report suspected child abuse or neglect …. may be reported to local law enforcement for criminal investigation and, upon conviction thereof, shall be guilty of a **misdemeanor**." (emphasis added). Okla. Stat. tit. 10A, § 1-2-101, § (C).

Any person with prolonged knowledge of ongoing child abuse or neglect who knowingly and willfully fails to promptly report such knowledge may be reported to local law enforcement for criminal investigation and, upon conviction thereof, shall be guilty of a **felony**. For the purposes of this paragraph, prolonged knowledge shall mean of at least six (6) months of child abuse or neglect." (emphasis added). Okla. Stat. tit. 10A, § 1-2-101, § (C).

The term "having reason to believe" ... a child is a victim of abuse, as set forth in Okla. Stat. tit. 10A, § 1-2-101, et seq. does not vest school personnel with the discretion to determine whether such abuse actually occurred.

"Once school personnel suspect or should suspect that a child may be sexually abused, they are divested of any discretion to determine ... whether the abuse actually occurred. If school personnel were allowed to determine whether reasonable cause existed or whether such abuse actually occurred before reporting the matter to [DHS], the goal of protecting children from sexual abuse would be undermined. Although the school board may initially investigate the credibility of any rumors of sexual abuse, whether there was reasonable cause to report the allegations is an objective determination. For purposes of the Reporting Act, the issue of whether school personnel have reasonable cause to report suspected allegations of abuse is determined by the objective belief of a reasonable person, not the school board's subjective belief." *J.M. v. Hilldale*, 2008 WL 294497 * 11. "Further, as with any other negligence claim, civil damage liability for failing to report complaints of child sexual abuse will only arise when it proximately causes injury to another." *Doe v. Coffee County Board of Education*, 852 S.W.2d 899, 909 (1993).

Plaintiff alleges Defendants failed to properly investigate and report parent complaints of sexually inappropriate behavior by Winters in 2018, and by students on November 4, 2019. The failure to investigate and report the inappropriate touching and ongoing sexual misconduct of which they became aware to law enforcement, the Department of Human Services, and to the parents of Plaintiff demonstrate a lack of proper training and supervision. (Second Amended Complaint at §§ 163-164).

Once the School District was informed that its employee may have abused a female student, the School District had constructive knowledge of such abuse. At that point, pursuant to Oklahoma statutory law, the School District had a duty to report the abuse to the Department of Human Services, and local law enforcement. Given the Reporting Act's mandatory language, the School District was divested of the exercise of discretion and the determination of policy based on the failure to report. Therefore, the Court finds the School District is not immunized under § 155(5) for Plaintiff's claim based on its failure to train.

### 4. Negligent Retention

Finally, Plaintiff alleges that even after the School District was notified of Winter's deviant behavior, they nonetheless retained him in their employment. Specifically, Plaintiff alleges that "in response to allegations of Winter's lewd comments and sexual misconduct, Defendants did not conduct an investigation. Defendants persisted in their action and inaction, even after they had actual knowledge of the harm suffered by students, including Jane Doe No.2 … Defendants should have exercised their inherent authority over school property to immediately prohibit Winters from entering school property and abusing Plaintiffs or other students. They did not. Defendants engaged in a pattern and practice of behavior that failed to fully investigate, alert, and protect students from sexual misconduct within the school district. Defendants conduct failed to ensure that Plaintiffs would not be subjected to ongoing and continuing assault and harassment." (Doc. No. 23, Second Amended Complaint, §§ 52-53, 56-72).

These allegations, taken in the light most favorable to Plaintiff are sufficient to establish a negligent retention claim.

## IV. CONCLUSION

The School District has discretion to develop, adopt and implement policies which comply with Oklahoma statute and Title IX. However, this is where the discretion ends. Once the policy decision is made, governmental liability is imposed for negligent execution of the policy. *J.M.*, 2008 WL 294497, at *11. Therefore, the School District was obligated to ensure its employees met the standards imposed by said policy - it was no longer within the School District's discretion to hire, supervise, train and retain employees who failed to promote a work environment free from unlawful discrimination, harassment and retaliation. It became the School District's duty to do so. Accordingly, the School District's Partial Motion to Dismiss is denied.

**IT IS SO ORDERED**, this 31st day of October, 2022.

TERENCE C. KERN
United States District Judge