# United States District Court
## for the Northern District of Oklahoma

---

Case No. 21-cv-240-JDR-SH

---

Jane Doe No. 2; Jane Doe No. 3,

*Plaintiffs,*

*versus*

Oologah-Talala Independent School District No. 4 of Rogers County, Oklahoma *also known as* Oologah-Talala Public Schools; *et al.*,

*Defendants.*

---

## OPINION AND ORDER

---

Trent Winters, a former middle school teacher and assistant basketball coach at Oologah-Talala Public Schools, is accused of sexual harassment by Plaintiffs Jane Doe No. 2 and Jane Doe No. 3. Plaintiffs brought this lawsuit against Mr. Winters, the School District, and various School District employees[1] alleging violations of, among other things, their constitutional rights under Title IX of the Education Amendments of 1972 and 42 U.S.C. § 1983. All parties have moved for summary judgment. Dkts. 108, 133, 135, 137. The motions are fully briefed and ripe for review. For the reasons discussed below, Plaintiffs' motion for summary judgment as to the federal law claims against the School District [Dkt. 108] is DENIED; the School District's motion

---

[1] The School District employees include Superintendent Max Tanner, School Counselor Dawn Martinez, Athletic Director and Title IX Coordinator Brady DeSpain, Assistant Superintendent Tony Sappington, and High School Principal Kevin Hogue. In addition, Plaintiffs brought claims against School Resource Officer DeWilton Rhoden. All claims originally brought against Officer Rhoden have been dismissed. Dkt. 166.

No. 21-cv-240

[Dkt. 133] is GRANTED IN PART; the School District employees' motion [Dkt. 135] is GRANTED IN PART; and Mr. Winters's motion [Dkt. 137] is GRANTED IN PART.

## I.

This is not the first time a School District teacher has faced allegations of sexual misconduct. Dkt. 108-3 at 6. Since 2016, four School District teachers other than Mr. Winters have been accused of sexual misconduct with students. *Id.* Each of these cases resulted in the offending teacher's resignation or termination and the surrender of his or her teaching license. *Id.* Since 2019, the Oklahoma State Department of Education has been monitoring the School District because of "the District's handling of teacher misconduct allegations involving sexual harassment and sexual assault." Dkt. 143 at 103.

### A.

Prior to joining the School District, Mr. Winters was a teacher and coach in another Oklahoma school district. Dkt. 108-2 at 4-5. He was suspended from his prior position and subsequently resigned after he participated in cyberbullying a student in a group message with other students. *Id.* Mr. Winters publicly apologized for his behavior in front of the previous district's school board. *Id.* The School District performed a federal background check on Mr. Winters before hiring him for the 2018-2019 school year. Dkt. 134-1. The background check did not indicate Mr. Winters had a criminal record. *Id.* Although the School District was aware of the issues involving Mr. Winters at his previous school, the School District did not contact any of Mr. Winters's previous employers. Dkt. 108-3 at 8. Nevertheless, Mr. Winters was hired by the School District as a middle school teacher and assistant girls'

No. 21-cv-240

basketball coach under his father, Doug Winters. Dkts. 108-2 at 2-3; 143 at 16.[2]

In November of 2018, Middle School Principal Kelli Dixon received a call from a parent who had overheard her daughter discussing a statement made by Mr. Winters. Dkt. 133-2 at 2. The parent asked Principal Dixon to "stay alert to the possibility" that Mr. Winters was making inappropriate comments in front of the students. Dkt. 143 at 3. Principal Dixon asked the parent to gather and provide more information, but never received a call back. Dkts. 133-2 at 2; 143 at 3. Nearly a month later, Principal Dixon followed up with the parent, who was unable to provide any additional information. *Id.* Principal Dixon did not investigate further, and this allegation was never reported to Superintendent Tanner or Director DeSpain. *Id.*

In April of 2019, Mr. Winters complained to Middle School Assistant Principal Nathan Smith that some of the male students were calling him "Coach Perv." Dkts. 133-2 at 2; 143 at 3. Assistant Principal Smith talked to the students and asked them not to talk negatively about Mr. Winters. *Id.* Assistant Principal Smith asked one of the student's fathers to "reiterate the importance of not talking bad about a teacher." *Id.* These events were never reported to Superintendent Tanner or Director DeSpain. Dkt. 143 at 3.

On May 9, 2019, Principal Dixon was informed of rumors that a student had shown Mr. Winters nude photos on Snapchat. Dkt. 143 at 4. Principal Dixon interviewed several students, but no one had personally seen any photos. *Id.* The student who was rumored to have sent the photos denied

---

[2] The Defendants argue that some of Plaintiffs' evidence should not be considered by the Court. Dkt. 154 at 1. Evidence produced at the summary judgment stage "may not need to be admissible at trial, [but] 'the *content or substance* of the evidence must be admissible.'" *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010) (quoting *Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir. 1995)). Generally, the grand jury testimony of the witnesses is "a reliable source of information which may be considered on summary judgment." *Arceo v. City of Junction City, Kans.*, 182 F. Supp. 2d 1062, 1081 (D. Kan. 2002). The Court has screened the evidence for inadmissible content and considers only evidence likely to be admissible at trial.

No. 21-cv-240

sending them. *Id.* After talking to several students, the only behavior Principal Dixon could substantiate was that Mr. Winters had made jokes to students about "what your momma did last night." Dkts. 133-2 at 3; 143 at 4. Principal Dixon reported the alleged comments to Superintendent Tanner on May 13, 2019; he asked her to conduct a full investigation. Dkt. 143 at 5.

During the investigation that followed, Principal Dixon was told that Mr. Winters stared at the female athletes during track and basketball, that Mr. Winters was rumored to want to have sexual relations with an eighth-grade student, that his flirtations with the female athletes prompted male students to call him "Coach Perv," and that he had made comments about which students he would "get with." Dkt. 143 at 5-6. One student stated that she did not like the way that Mr. Winters joked with the students. *Id.*

Principal Dixon discussed her findings with Mr. Winters, who denied the allegations. Dkt. 143 at 6. Principal Dixon told Mr. Winters that his joking was inappropriate and that he should not be alone with students in his classroom. *Id.* at 6-7. Principal Dixon determined that Mr. Winters did not "recogniz[e] that some of his joking was inappropriate." Dkts. 133-2 at 3; 143 at 7. She reported to Superintendent Tanner that there was no evidence that Mr. Winters had directed sexually inappropriate comments towards specific students, and Mr. Winters was allowed to maintain his teaching and coaching positions. *Id.* The record does not show that the allegations against Mr. Winters were ever reported to the High School, Athletic Department, or Director DeSpain.

B.

The events complained of by the Plaintiffs mainly took place in the school year following the above-referenced investigation. In the Fall of 2019, the girls' basketball team was practicing and preparing to play a team with taller girls. Dkt. 137-3 at 9. Mr. Winters participated in the drill to mimic the taller girls. *Id.* While Mr. Winters was guarding Jane Doe No. 2, he touched her breast. *Id* at 7. Following the contact, Mr. Winters told Jane Doe No. 2

4

No. 21-cv-240

"there is more where that came from." *Id.* The parties disagree as to whether the contact was intentional, whether the contact was of a sexual nature, and the meaning of Mr. Winters's comment. Dkts. 137 at 4; 150 at 2. Jane Doe No. 2 did not report the contact to her parents or the School District. Dkt. 137-3 at 15.

Around the same time, Coach Jahn had mentioned to another teacher that basketball practice was a negative environment and that she felt like Doug Winters and Mr. Winters were "teaching the girls to be in abusive relationships" based on their treatment of players in terms of "[p]roximity, intimidation and stuff like that." Dkt. 143 at 15. In her annual review, Principal Hogue advised Coach Jahn not to make comments about the coaches because he "would hate for [her] to ruin a good thing." *Id.* at 16. Coach Jahn assumed this comment was in reference to her coaching and teaching positions, and she became hesitant to report any concerns she had going forward unless it "was a sure thing." *Id.*

On November 4, 2019, several of the female basketball players, including Jane Doe No. 2 and Jane Doe No. 3, met with the school counselor, Dawn Martinez, to discuss concerns they had about Mr. Winters. Dkts. 137-3 at 12-13; 137-4 at 18-19. They reported that Mr. Winters had told Jane Doe No. 2 that she could find someone better to date than her current boyfriend, and that, while stretching with a teammate, she looked like she had been in the same position before. Dkt. 137-3 at 8, 19. He also allegedly told Jane Doe No. 3 that he would have trouble finding her a uniform because of the size of her butt. Dkt. 137-4 at 4-7. Coach Jahn had previously told Jane Doe No. 3 that Mr. Winters said that if he were to "get with" a student, it would be Jane Doe No. 3. Dkts. 137-4 at 16; 143 at 17. Mr. Winters also made statements to a group of players, including the Plaintiffs, indicating that he took his wife's virginity and stating his preferred type of condoms. Dkts. 137-3 at 9-23; 137-4 at 7-8.

No. 21-cv-240

Counselor Martinez took notes at the meeting with the students, but she did not have the students write down their statements.[3] Dkt. 137-4 at 19. She sent the players to basketball practice and reported the allegations to Principal Hogue and Superintendent Tanner. Dkts. 133-5 at 2; 133-6 at 2; 133-7 at 2; 143 at 112. Director DeSpain learned of the allegations from Jane Doe No. 2's stepfather later that afternoon. Dkt. 133-8 at 2. That evening, the Plaintiffs attended a basketball scrimmage where Mr. Winters was also present. Dkt. 137-3 at 24. On November 5, Principal Dixon, Director DeSpain, and Superintendent Tanner met with Mr. Winters and told him that he would no longer be allowed to coach but would be able to continue teaching at the middle school. Dkts. 133-2 at 3; 133-7 at 3; 133-8 at 2; 143 at 7-8.

On November 15, 2019, Assistant Superintendent Sappington set up a meeting with Jane Doe No. 2 and her parents. Dkt. 133-9 at 2. The meeting was ultimately cancelled and never rescheduled. *Id.* Principal Hogue advised the Oklahoma Attorney General that the school officials were not allowed to interview Jane Doe No. 2. Dkt. 143 at 27. Prior to Thanksgiving break, the Oklahoma Department of Education informed Superintendent Tanner that there had been a complaint made against the School District. Dkt. 133-7 at 3. No one was contacted or interviewed about the allegations during the week of Thanksgiving or the two snow days that followed. *Id.* On December 9, 2019, Principal Hogue and Counselor Martinez met with the students who had reported Mr. Winters earlier in November, except for Jane Doe No. 2, and obtained statements. Dkts. 133-6 at 2; 133-7 at 3. Counselor Martinez and Principal Hogue provided the students' statements to Superintendent Tanner and reported the allegations to the Department of Human Services. DHS stated that the report was unnecessary. Dkts. 133-5 at 2; 133-6 at 2-3.

---

[3] The School District maintains that its staff is trained annually on reporting obligations under Title IX and other applicable state laws. Dkts. 133-5 at 3; 133-7 at 3; 133-9 at 3.

No. 21-cv-240

Based on the students' statements, the School District suspended Mr. Winters with pay on December 10, 2019. Dkts. 133-2 at 3; 133-7 at 3. A few days later, after learning that the School District was going to fire him, Mr. Winters resigned. Dkt. 108-2 at 5. On June 25, 2020, the Oklahoma State Department of Education assigned the School District the status of Accredited with Probation and issued a public reprimand for "failing to take appropriate actions to protect students from potential harm" based on how the School District had responded to allegations of teachers' sexual misconduct, including their response to the allegations against Mr. Winters. Dkt. 108-11 at 1.

Jane Doe No. 2 claims that Director DeSpain told her she was being "dramatic" about the allegations and that she should "shake it off." Dkt. 149 at 41-42. Director DeSpain denies making this statement. Dkt. 108-4 at 7. The Plaintiffs maintain that Doug Winters decreased their playing time during their senior year. Dkt. 143 at 161-62. Plaintiffs also sought medical treatment for their anxiety that they attribute to Mr. Winters's sexual harassment. Dkt. 143 at 123, 149.

## II.

Plaintiffs argue that the Defendants violated their constitutional rights under Title IX and 18 U.S.C. § 1983. First, Plaintiffs argue that Mr. Winters violated these rights by sexually harassing them. Dkt. 150. And second, Plaintiffs claim that the School District and its employees violated these rights by failing to conduct a proper investigation into the students' allegations against Mr. Winters. Dkts. 108; 144. The parties seek summary judgment on these constitutional claims.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the

No. 21-cv-240

nonmoving party." *Id*. In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id*. at 249. At this stage, the Court must "view the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Schaffer v. Salt Lake City Corp.*, 814 F.3d 1151, 1155 (10th Cir. 2016) (quoting *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 997 (10th Cir. 2011)) (internal quotations omitted).

A.

The Court begins by addressing Plaintiffs' Title IX claim against the School District, which is the subject of cross-motions for summary judgment. Dkts. 108, 133. Title IX states that "[n]o person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Sexual harassment by a teacher is actionable under Title IX. *See, e.g., Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281-82 (1998); *Franklin v. Gwinnett Cty. Pub. Schs.*, 503 U.S. 60, 75 (1992). A school district may be held liable for harassment under Title IX, but only if the harassment is a result of its own misconduct. *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). To establish a school district's culpability, a plaintiff must prove that (1) a school district official had actual notice of the alleged harassment, (2) the official was deliberately indifferent to the harassment, (3) and the harassment was so severe, pervasive and objectively offensive that it, (4) deprived the victim of access to the educational benefits or opportunities provided by the school. *Id*. at 650; *Murrell v. Sch. Dist. No. 1, Denver*, 186 F.3d 1238, 1246 (10th Cir. 1999).

The School District first argues that it cannot be held liable under Title IX because it did not have actual notice of Plaintiffs' allegations against Mr. Winters until November 4, 2019. Dkt. 154 at 29-30. Plaintiffs respond

No. 21-cv-240

that the School District was generally aware of Mr. Winters's misconduct but failed to properly investigate it. Dkts. 108 at 33-34; 159 at 9.

### 1.

It is well established that "reported incidents of harassment against students other than the plaintiff may establish actual notice of Title IX discrimination." *Forth v. Laramie Cty. Sch. Dist. No. 1*, 85 F.4th 1044, 1056 (10th Cir. 2023) (citing *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1153 (10th Cir. 2006); *Doe v. Sch. Bd. of Broward Cty.*, 604 F.3d 1248, 1257 (11th Cir. 2010)). "'[A]ctual notice requires more than a simple report of inappropriate conduct by a teacher.'" *Escue*, 450 F.3d at 1154 (quoting *Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 62 (D.Me. 1999)). "The analytical focus should be on whether the evidence—viewed in its totality—could be said to have given a school district actual notice of a substantial risk of Title IX discrimination in its programs." *Forth*, 84 F.4th at 1060.

Plaintiffs have failed to establish a genuine dispute as to notice even where prior complaints are considered.[4] The School District knew that Mr. Winters cyberbullied a student at his prior school; knew that a student had talked about an inappropriate statement Mr. Winters had made; that male student referred to Mr. Winters as "Coach Perv;" and that Mr. Winters had inappropriately joked with students. But these reports, which centered around inappropriate comments, did not notify the School District that Mr. Winters would later sexually assault Jane Doe No. 2. *See, e.g., Gebser*, 524 U.S. at 274 (holding that substantiated allegations of inappropriate comments during class were "insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student"). And the

---

[4] The Tenth Circuit has not taken a stance on whether notice in the Title IX context "may consist of prior complaints or must consist of notice regarding current harassment in the recipient's program." *Escue*, 450 F.3d at 1153; *see also Forth*, 85 F.4th at 1056-57. Prior complaints cannot be "'too dissimilar' or 'too distant in time' compared to the harassment underlying the plaintiff's Title IX suit." *Forth*, 85 F.4th at 1056 (quoting *Escue*, 450 F.3d at 1153-54).

No. 21-cv-240

reports of prior inappropriate jokes that were not directed at any specific student did not put the School District on notice that Mr. Winters would make specific sexual comments about Jane Doe No. 3's body. *See, e.g., Escue*, 450 F.3d at 1154 (finding that the University did not have actual notice because the prior complaints "involved significantly different behavior—a single incident of inappropriate touching and a series of inappropriate name-calling" which did not amount to "the degree of overt and pervasive harassment that constitute[s] a hostile educational environment"). The prior incidents known by the School District were different in kind from those alleged by Plaintiffs. As such, the incidents did not put the School District on notice of a substantial risk of discrimination.

### 2.

Even if the School District had actual notice prior to the November 4 complaint, the School District was not deliberately indifferent to the reports. To give rise to liability under Title IX, "[t]he failure to respond to discrimination … must amount to 'deliberate indifference,' or 'an official decision … not to remedy the violation.'" *J.M. v. Hilldale Indep. Sch. Dist. No. 1*-29, 397 F. App'x 445, 450 (10th Cir. 2010) (quoting *Gebser*, 524 U.S. at 290). Thus, a school district can only be liable "where it has made a conscious decision to permit sex discrimination in its programs." *Murrell*, 186 F.3d at 1246. Although Title IX does not require a specific response to reports of sexual harassment, the response must be reasonable "in light of the known circumstances." *Davis*, 526 U.S. at 648. "Often, the minimum required response to avoid 'deliberate indifference' is for the school to conduct a legitimate investigation." *J.M. v. Hilldale Indep. Sch. Dist. No. I-29*, No. CIV 07-367-JHP, 2008 WL 2944997, at * (E.D. Okla. July 25, 2008).

The School District conducted legitimate investigations here. When the School District received a phone call regarding an inappropriate statement by Mr. Winters, Principal Dixon asked the parent to find out more information. Although the parent never followed up, Principal Dixon did.

No. 21-cv-240

Despite that effort, the School District was unable to determine the contents of the statement, when Mr. Winters made the statement, or where Mr. Winters made the statement. Considering the limited information that the parent provided to Principal Dixon, her response to the report was reasonable.

When the School District learned that students were calling Mr. Winters names, Assistant Principal Smith spoke with the students, none of whom knew where the nickname came from. Asisstant Principal Smith asked the students not to call Mr. Winters names and spoke with one of the student's fathers. When a teacher reported a rumor about Mr. Winters a few weeks later, Principal Dixon conducted more interviews, and learned that Mr. Winters was telling students inappropriate jokes. She reported this finding to Superintendent Tanner, who told Principal Dixon to conduct a full investigation. Principal Dixon attempted to do so, but no one was able to provide any information as to what Mr. Winters had said or to whom his statements were directed. Following her investigation, Principal Dixon met with Mr. Winters and told him that he should not make inappropriate jokes or be alone with students in his classroom.

The Court concludes that the School District conducted a legitimate investigation and reprimanded Mr. Winters based on its findings. Whether or not the School District reached the correct conclusion in the investigation is irrelevant; the only requirement is that the response to the report must be reasonable. *See, e.g., Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 174 (1st Cir. 2007) ("In hindsight, there may be other and better avenues that the [School District] could have explored … [b]ut Title IX does not require … flawless investigations [or] perfect solutions."), *rev'd* on other grounds; *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir. 1998) ("Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference.") Here, the School District conducted interviews and gathered information until it could find no new information, and then took remedial measures based on the information obtained.

No. 21-cv-240

*See, e.g., Payne v. Vian Pub. Schs.*, 2018 WL 4265212, at *9 (E.D. Okla. Sept. 6, 2018) (school district's actions were reasonable where it did not contact police or DHS when the victim denied any contact and where it had no firsthand knowledge of harassment). This response to Mr. Winters's conduct prior to November of 2019 was reasonable and it does not amount to deliberate indifference.

The School District's investigation of the November 2019 report was also reasonable. When the Plaintiffs reported Mr. Winters's misconduct to Counselor Martinez, she notified Principal Hogue and Superintendent Tanner. Director DeSpain learned of the report later that afternoon. The next day, Mr. Winters was removed from his coaching positions. On December 9, 2019, following the Thanksgiving holiday and two snow days, the students were interviewed and asked to make written statements. Mr. Winters was suspended with pay the next day and ultimately resigned a few days later. The investigation and response were reasonable.

Plaintiffs argue that the School District was deliberately indifferent to this report because the students were sent back to basketball practice and allowed to attend a scrimmage where Mr. Winters was present. But Plaintiffs have not provided evidence that further sexual harassment occurred because of the School District's response. *See, e.g., Escue*, 450 F.3d at 1156 (finding that the school was not deliberately indifferent where the student failed to allege that the school's "response to her allegations was ineffective such that she was further harassed"). There was, therefore, no deliberate indifference that "caused [Plaintiffs] to undergo harassment or [become] liable or vulnerable to it." *Davis*, 526 at 645. Summary judgment on these facts is appropriate,[5] as the Plaintiffs have not shown that the School District's responses were clearly unreasonable, nor have they shown that it led to further sexual

_____

[5] *See Davis*, 526 U.S. at 649 ("In an appropriate case, there is no reason why courts, on a motion … for summary judgment … could not identify a response as not 'clearly unreasonable' as a matter of law.")

No. 21-cv-240

harassment. As for the Title IX claim, Plaintiffs' motion for summary judgment is DENIED and the School District's motion is GRANTED.

## B.

The Court next addresses Plaintiffs' federal claims against the individual School District employees other than Mr. Winters.[6] Plaintiffs assert that the employees violated their constitutional rights to due process and equal protection by failing to properly investigate the complaints against Mr. Winters and exposing Plaintiffs to Mr. Winters's harassment. Dkt. 147. The employees argue that they are entitled to qualified immunity and should be granted summary judgment on the federal claims. Dkt. 135.

Qualified immunity shields public officials "'from damages actions unless their conduct was unreasonable in light of clearly established law.'" *Gutierrez v. Cobos*, 841 F.3d 895, 899 (10th Cir. 2016) (quoting *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014)). It "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Once a defendant asserts qualified immunity, the burden shifts to the plaintiff to show that: (1) the defendant's actions violated a federal constitutional or statutory right, and (2) the right was clearly established at the time of the defendant's unlawful conduct. *Id.* at 232. The court is required to grant qualified immunity if the plaintiff fails to satisfy this burden. *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017).

## 1.

Plaintiffs claim that the employees violated their Fourteenth Amendment right to equal protection by failing to investigate Mr. Winters's misconduct. Dkt. 147 at 16-18. The Fourteenth Amendment provides that "[n]o

---

[6] All claims against the employees in their official capacity were previously dismissed as duplicative. Dkt. 55 at 20-21.

No. 21-cv-240

State shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To prove an equal protection claim, a plaintiff must show that the defendant, acting under the color of state law, treated the plaintiff differently than others who were similarly situated. *See, e.g. Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 659 (10th Cir. 2006).

A school district employee "may be held liable under section 1983 upon a showing of deliberate indifference to known sexual harassment." *Murrell v. Sch. Dist. No. 1, Denver*, 186 F.3d 1238, 1250 (10th Cir. 1999). The deliberate indifference must amount to "a supervisor or employer [who] participates in or *consciously acquiesces* in sexual harassment by a … third party." *Murell*, 186 F.3d at 1250 (quoting *Noland v. McAdoo*, 39 F.3d 269, 271 (10th Cir. 1994)) (internal quotations omitted). As discussed above, the Plaintiffs have failed to establish that Mr. Winters' sexual harassment was known to the School District or its employees prior to November 4, 2019, and that, once they learned of the behavior, they were deliberately indifferent. There are no actions by the School District or its employees that amount to deliberate indifference to known sexual harassment. On the contrary, the employees of the School District acted when presented with sexual harassment in November 2019. Thus, the employees' actions in this case do not amount to a violation of the Plaintiffs' equal protection rights.

2.

Plaintiffs also claim that the employees violated their constitutional rights to due process by creating the danger which harmed them. Dkt. 147 at 16-18. Liability under a danger-creation theory requires "an intent to harm" or "an intent to place a person unreasonably at risk of harm." *Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir. 1995) (citing *Medina v. City & Cty. of Denver*, 960 F.2d 1493, 1496 (10th Cir. 1992)). To prove a danger-creation claim, the Plaintiffs must show that (1) the employees created the danger or increased Plaintiffs' vulnerability to the danger; (2) Plaintiffs were members of

14

No. 21-cv-240

a limited and specifically definable group; (3) the employees' conduct put Plaintiffs at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious and known; (5) the employees acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, shocks the conscience. *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1126 (10th Cir. 2008) (citing *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1281 (10th Cir. 2003)).

Plaintiffs argue that the employees affirmatively created danger by: (1) failing to suspend Mr. Winters following the first two reports; (2) admonishing Coach Jahn for talking about the basketball team's "toxic environment;" (3) advising the District Attorney that Jane Doe No. 2 was not cooperating with the investigation; (4) telling Jane Doe No. 2 to let go of the allegations; and (5) allowing Doug Winters to remain head basketball coach. Dkt. 147 at 17-18. The employees argue that these decisions were not affirmative conduct but should instead be characterized as negligent acts. Dkt. 157 at 10.

The Court finds there is no genuine issue of fact as to whether the employees *created* the danger that caused the harm. For the employees to have created the danger, the Plaintiffs must prove "deliberately wrongful government decisions." *See, e.g., Uhlrig*, 64 F.3d at 573-74. But decisions and actions contested by Plaintiffs speak at most to potential negligence claims and are not evidence of any *intentional* acts to expose the Plaintiffs to Mr. Winters's sexual harassment; the employees' potential negligence is insufficient to prove liability under § 1983. *See Rost*, 511 F.3d at 1126.

Further, none of the employees' decisions reach the high threshold required for a finding of conduct that shocks the conscience.[7] "[T]he shocks the conscience standard requires a high level of outrageousness requiring something more than negligent, reckless, or even intentional conduct."

---

[7] Whether conduct shocks the conscience is a question of law for the Court. *See, e.g., Kerns v. Indep. Sch. Dist. No. 31 of Ottawa Cty.*, 984 F. Supp. 2d 1144, 1151 (N.D. Okla. 2013) (collecting cases).

No. 21-cv-240

*Schaefer v. Las Cruces Pub. Sch. Dist.*, 716 F. Supp. 2d 1052, 1075 (D.N.M. 2010) (citing *Camuglia v. The City of Albuquerque*, 448 F.3d 1214, 1222-23 (10th Cir. 2006)) (internal quotations omitted). One example of this high standard is *Sutherlin v. Indep. Sch. Dist. No. 40*, 960 F. Supp. 2d 1254 (N.D. Okla. 2013). In *Sutherlin*, the Court considered whether a school district was liable where the school officials had witnessed a student being physically assaulted and did not intervene, placed the student in a room alone with a student they knew bullied him, called the student names in front of other students, did not investigate multiple reports of bullying and harassment, and ultimately discouraged students from reporting bullying. *Id.* at 1262-63. This conduct was not "brutal and offensive enough to meet the high standard of conscience shocking behavior." *Id.* (internal quotations and citations omitted). Here, the conduct is far less egregious than the conduct in *Sutherlin*. Even if the employees did everything that Plaintiffs accuse them of, the conduct is not sufficiently conscious shocking.

Because the employees did not violate Plaintiffs' constitutional rights under the equal protection or due process clause, they are entitled to qualified immunity. The employees' motion for summary judgment [Dkt. 135] regarding the § 1983 claims is GRANTED.

## C.

Plaintiffs bring the same federal law claims against the School District that they bring against the employees. Because the Court has found that the individual School District employees did not commit equal protection or due process violations, the School District is also entitled to summary judgment on those claims. *Wilson v. Meeks*, 98 F.3d 1247, 1255 (10th Cir. 1996) ("The district court correctly concluded no municipal liability could be found in this case because there was no constitutional violation committed by any of the individual defendants."). The School District's motion for summary judgment on the § 1983 claims is GRANTED; the Plaintiffs' motion is DENIED.

No. 21-cv-240

## D.

Next, the Court considers Mr. Winters's motion for summary judgment on Plaintiffs' § 1983 claims. Dkt. 137. To seek a claim for relief under § 1983, Plaintiffs must prove that (1) a right secured by the constitution or law of the United States was violated, and (2) the alleged violation was committed by Mr. Winters while he was acting under the color of state law. *Hall v. Okla. Dep't of Human Servs.*, No. 15-CV-0670-CVE-TLW, 2016 WL 2903266, at *3 (N.D. Okla. May 18, 2016) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)). The parties do not dispute that Mr. Winters was acting under the color of state law at all relevant times; the Court focuses its analysis on whether Mr. Winters violated the Plaintiffs' rights to substantive due process and equal protection.

### 1.

The equal protection clause of the Fourteenth Amendment guarantees that "no state shall … deny to any person within the jurisdiction to the equal protection of the laws." U.S. Const. amend. XIV, § 1. "[S]exual harassment by a state actor can constitute a violation of the equal protection clause." *See, e.g., Murrell v. Sch. Dist. No. 1, Denver*, 186 F.3d 1238, 1249 (10th Cir. 1999); *see also Doe v. Hutchinson*, 728 F. App'x 829, 832 (10th Cir. 2018). To constitute a violation, the harassment must be so severe and pervasive as to deprive the student of an educational benefit or opportunity. *See, e.g., Sturdivant v. Fine*, 22 F.4th 930, 936 (10th Cir. 2022); *see also Ashaheed v. Currington*, 7 F.4th 1236, 1250 (10th Cir. 2021).

The record does not show that Mr. Winters's harassment deprived Plaintiffs of any educational benefit. The Tenth Circuit has held that changes in class attendance, transfers out of classes, and changes in schools are harms that constitute deprivations of educational benefits. *See, e.g., Sturdivant*, 22 F.4th at 937 (finding that a reasonable jury could determine the student was deprived of an educational benefit where she missed four classes); *Hutchinson*, 728 F. App'x at 833 (plaintiff had sufficiently pleaded an equal

No. 21-cv-240

protection violation where she withdrew from school because of teacher's sexual comments and bullying); *J.M. ex rel. Morris v. Hilldale Indep. Sch. Dist. No. 1-29*, 397 F. App'x 445, 455 (10th Cir. 2010) (plaintiff established that she was denied access to education where she transferred to another school district after having a sexual relationship with a teacher). Plaintiffs do not allege these types of injuries resulted from Mr. Winters's harassment.

Instead, Plaintiffs complain they lost playing time during basketball games after Mr. Winters's resignation. Plaintiffs pointed to no case law showing that loss of playing time amounts to an educational deprivation. But even if they had, Plaintiffs have failed to provide any evidence that their loss of playing time was caused by or tied to Mr. Winters's harassment. Where there is no evidence that the harassment was the direct cause of Plaintiffs' harm, there can be no equal protection violation. *See, e.g.*, *Arabalo v. City of Denver*, No. 11-cv-02343-MSK-MEH, 2013 WL 10871817, at *7 (D. Colo. Aug. 26, 2013) (concluding that to bring a claim under § 1983, the plaintiffs were required to allege that the defendant's actions were the proximate cause of the plaintiff's injuries). Because Plaintiffs have not provided any evidence that would allow a reasonable trier of fact to conclude that they were deprived of an educational benefit due to Mr. Winters's harassment, Mr. Winters's motion for summary judgment on the equal protection claim is GRANTED.

2.

Plaintiffs next argue that Mr. Winters deprived them of their constitutional right to due process. A claim brought under the due process clause is actionable when a government actor deprives someone of life, liberty, or property in a manner that "shocks the conscience." *Abdi v. Wray*, 942 F.3d 1019, 1027 (10th Cir. 2019) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). The offensive conduct must be so egregious and outrageous that it amounts to more than an ordinary tort. *See Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 528 (10th Cir. 1998).

No. 21-cv-240

A teacher's sexual assault of a student is an "intrusion of the student's bodily integrity" that may violate a student's due process rights. *Abeyta v. Chama Valley Indep. Sch. Dist. No. 19*, 77 F.3d 1253, 1255 (10th Cir. 1996). In contrast, verbal harassment, standing alone, will not ordinarily give rise to a due process violation. *Id.* (finding that teacher repeatedly calling the student a "prostitute" in front of other students over several months was not an actionable due process claim because "[t]here were no allegations … of sexual assault, molestation, or touching of any sort"). Jane Doe No. 3's allegations against Mr. Winters are limited to comments about her body and other sexual topics. These statements, while certainly inappropriate, are not sufficiently conscience shocking to amount to a due process violation.

Jane Doe No. 2, however, has presented evidence that Mr. Winters intentionally touched her breast and made a sexual comment about that contact. The question, then, is whether the contact and comment together were sufficiently conscience shocking to violate Jane Doe No. 2's due process rights. Not every instance of sexual assault satisfies this standard and the line as to what is and is not conscience shocking in the context of teacher-on-student sexual assault is not definite. *N.F. on Behalf of M.F. v. Albuquerque Pub. Schs.*, No. 14-cv-699 SCY/RHS, 2015 WL 13667294, at *2 (D.N.M Jan. 30, 2015) (citing *Williams v. Berney*, 519 F.3d 1216, 1223 (10th Cir. 2008)).

Conduct at issue in this case is less egregious than that in *Doe as Next Friend of P.D. v. Indep. Sch. Dist. No. 3 of Okmulgee Cty.*, No. CV-21-305-JAR, 2023 WL 149974, at *1 (E.D. Okla. Jan. 10, 2023). In that case the court found that the teacher's sexual assault was conscience shocking because he "touched [the student's] shoulder, back, lower back, leg, knee, and genital area," "stood in a position where his genitals were touching her head," and followed the student into the women's restroom. *Id.* at *3. Here, by contrast, there was a single touching incident and it occurred during basketball practice, a public place. This case is therefore unlike *Doe*.

No. 21-cv-240

Further, conduct alleged here is more akin to other cases where courts found that no due process violation occurred. For example, in *Lillard v. Shelby Cty. Bd. of Educ.*, a teacher rubbed a student's stomach and made suggestive remarks to the student. 76 F.3d 716, 726 (6th Cir. 1996). The court found this conduct "deplorable," but held it was not "of the outrageous and shocking character that is required for a substantive due process violation." *Id.* Similarly, in *Gilliam v. USD #244 Sch. Dist.*, the court determined that there was no due process violation where the teacher had pressed his torso into the student's back and whispered a suggestive comment in her ear while she was standing at the copy machine in the school office. 397 F. Supp. 2d 1282, 1288 (D. Kan. 2005). To reach this conclusion, the court focused on the fact that this contact "consisted of a single isolated incident in a public place." *Id.*

The Court finds that the single public contact complained of by Jane Doe No. 2 is like that of the contact in *Gilliam*. Here, there was an isolated instance of touching which occurred in a public place with several witnesses. There are no other allegations that Mr. Winters touched Jane Doe No. 2 inappropriately. The only other alleged inappropriate comment directed at Jane Doe No. 2 prior to the contact during practice was a statement about her boyfriend. If Mr. Winters's contact was intentional, it was undoubtedly inappropriate, but it was isolated, limited, and public. The conduct does not reach the conscience shocking level required for a due process violation. Mr. Winters's motion for summary judgment as to the § 1983 claims is GRANTED.

### E.

For the reasons discussed above, the Court DENIES Plaintiffs' Motion for Summary Judgment [Dkt. 108] and GRANTS IN PART the Defendants' Motions for Summary Judgment [Dkts. 133, 135, 137] with respect to the Title IX and § 1983 claims. This leaves only Jane Doe No. 2's state-law claims for resolution by the Court. The Court DECLINES to exercise supplemental jurisdiction over those claims and will remand those claims to the Rogers County District Court by separate order.

No. 21-cv-240

DATED this 28th day of August 2024.

JOHN D. RUSSELL
*United States District Judge*